EDWIN S. ROSS, HAMILTON D. WARE, WILLIAM P. WORTHINGTON, Trustees of Arden,

*vs.*

SAMUEL FREEMAN, LOUIS W. MARMORSTEIN, HARRY J. PRESSMAN, FRED WHITESIDE, FRANK E. HARRISON.

*New Castle, July* 23, 1935.

*William F. Kurtz* and *Aaron Finger*, of the firm of Richards, Layton & Finger, for complainants, cross-defendants.

*Hugh M. Morris* and *G. Burton Pearson, Jr.*, for defendants, and cross-complainants.

THE CHANCELLOR: A motion under *Rule* 44 for a decree notwithstanding answer is in the nature of a de-

murrer to the answer. *Jones v. Maxwell Motor Co.,* 13 *Del. Ch.* 76, 115 *A.* 312. Like a demurrer it admits for the moment that the facts set forth in the answer are true. But the admission goes only as to facts. Although a demurrer confesses the matters of fact stated in the bill to be true, it does not admit any matters or conclusions of law which are suggested in the bill or inferred from the facts stated. *Daniell's Chancery Pleading and Practice,* (4th Ed.) *p.* 545. As a motion for decree notwithstanding answer is in the nature of a demurrer to the answer, the same principle is applicable in defining the extent of the admission which the motion makes. When, therefore, the defendants' answer denies the legal result which the complainants allege flows from the facts charged in the bill, the motion does not admit the truth of the denial. It is for the court to say whether the alleged and controverted legal conclusion does in point of law emerge from the fact statements.

In disposing of the motion under *Rule* 44, the facts, as distinguished from assertions of legal propositions, which are averred in the answer are to be taken as true; and, similarly, in disposing of the demurrer to the cross-bill the facts alleged therein are to be taken as true. The facts alleged in both the answer and cross-bill are the same and are stated in substantially the same language. They are in amplification of the facts as alleged in the bill, but not in material conflict therewith. The facts are as follows.

In 1901 certain lands located in New Castle County were conveyed in fee simple to William L. Price, Frank Martin and George F. Stevens upon the trusts therein specified. These lands embrace the area of what is now known as the Village of Arden. The purpose of the trust was to found a village or community in which small industries and crafts would be encouraged on the part of people in moderate financial circumstances and to adopt in said village, in so far as practicable under existing laws, the system of land tenure and taxation advocated by Henry George and known as the "single tax." The community was

thus intended to demonstrate in a practical way the operation of the single tax theory which its well known originator had advocated in his book entitled "Progress and Poverty."

The trusts upon which the title was held were as follows:

"In Trust Nevertheless, to permit and suffer said premises to be occupied, used and enjoyed by such persons as shall constitute and be and form parts of a community for occupying, using and enjoying the same and the various parts thereof under such provisions, restrictions, limitations, conditions, charges and arrangements of whatsoever description as the said grantees their successors, heirs and assigns shall from time to time hereafter make, prescribe, ordain, provide or institute with full power on their part to change, alter or amend any such provisions, arrangements and limitations as they shall from time to time make and also with full power on the part of said grantees to regulate and prescribe the formation from time to time of said community and to say who may become members thereof, and also with full power in case said community shall not, in their judgment, warrant its continuance, to terminate the use and occupation of said premises by said community and the members thereof, all in their absolute discretion and with power to supply vacancies, should any occur in their, the said grantees, own number, which it is intended shall be and continue to be three, it being expressly hereby provided that upon all questions requiring the exercise of said grantees' discretion, the action of a majority of them shall be decisive."

The trustees endeavored to colonize the land. Leases of lots were offered to such persons as might wish to participate in the Arden experiment and to become residents of the new colony. For the first few years after the deed was made, a small number of persons acquired leases for ninety-nine years. The growth of the village was, however, slow. This was due to the fact that the terms and conditions upon which the lots were leased and the broad and comprehensive powers vested in the trustees by the deed of 1901 rendered the situation of leaseholders uncertain and insecure, particularly with reference to the amount of rentals with which a leaseholder might be charged in the future. The precise terms and conditions of the early leases are not set out in any of the pleadings. A reading of the

trust clause above quoted, discloses the extent of the broad, if not arbitrary, power which the trustees retained over the leaseholders in all matters touching the terms and conditions of their tenures. It is easy to understand why a prospective resident would hesitate, in the face of those provisions, to lay out his money in erecting improvements upon the land.

The trustees and those interested in the experiment concluded that the foregoing considerations explained the slowness of the community's growth. They concluded that more of certainty and security needed to be offered to prospective leaseholders if the community was to develop.

Accordingly in 1905 the trustees, together with other interested persons, set about to provide means to meet the situation. Under the direction of the trustees a committee was appointed to draft a constitution and by-laws for the administration of the affairs of the village and for putting into effect the purpose of the trust, to draft a new form of lease which would provide a method for the fixing of the rentals, and to amend the trusts which the deed of 1901 specified. Such a committee was appointed. One of the trustees, George F. Stevens, was a member.

A constitution and by-laws were drafted and approved, the answer avers, by the then leaseholders, residents and trustees of Arden. It is unnecessary to set out these documents in full. The preamble to them is in part as follows:

"We, the leaseholders and residents of Arden, being desirous of fulfilling the wishes of the founders of this village," etc.

From the preamble it thus appears that the adoption of the constitution and by-laws was the act of the leaseholders and residents. The trustees, so far as the recital shows, were not among the adopting persons. If they were, as the answer avers and the cross-bill alleges, evidence *aliunde* the documents is necessary to show it.

One of the provisions of the constitution is that "the rentals shall be assessed to correspond to the value or de-

sirableness of each plot as determined by the Ardenfolk or their duly elected representatives acting as assessors."

The by-laws provide for a board of seven assessors, whose duty it is to "make yearly assessments of the rental value of lands in Arden and report same to regular August meeting of the Ardenfolk, whose decision shall be final, subject to the legal rights of the leaseholders and the trustees."

Shortly after the adoption of the constitution and by-laws, a new form of lease was drafted, in harmony with those documents. Said form of lease, in the particular with which the case is concerned, provided that the rental should be a named sum payable in advance for the year or balance of the year in which the lease might be granted, and thereafter "such amount as shall be assessed against it (the lot) by the assessors of Arden, subject to appeal to a meeting of all the residents of the community. And the said assessment shall equal as nearly as possible the full rental value of the land, excluding improvements, etc."

Outstanding leases were exchanged for new ones executed in the re-drafted form. The defendants hold leases in the new form.

On January 31, 1908, the trustees executed another deed covering the lands in question, which *inter alia* restated the trust as follows:

"And Whereas the said conveyance of said lands was made upon certain trusts which it is desired by the parties aforesaid to restate and amend, the said lands are hereby declared to be held by the said William L. Price, Frank Martin and George F. Stephens, upon the following trusts and upon them only, viz: in trust to lease such portions of said land as may seem good to the said trustees and their successors, to such persons and for such terms as they the said trustees shall determine, the lease in each case to reserve, as rent, the full rental value of the premises demised by said lease; to pay all state and local taxes out of and from the rents received so far as these suffice to suffer all persons to whom land shall be leased as aforesaid, who constitute a community so long as they continue such lessees, to enjoy and use for common purposes such of the lands

which are the subjects of this deed as the trustees aforesaid shall not have demised to individuals or devoted to purposes other than common; to apply all sums of money received as rents, in excess of the amount needed for the purposes of paying the taxes, to such common uses desired by a majority of the residents as in the judgment of the trustees, are properly public, in that they cannot be left to individuals without giving one an advantage over others; and in further trust if at any time in the judgment of a majority of the residents agreeing with a majority of the trustees the community shall not warrant its continuance to declare the dissolution thereof, and thereupon to sell the land aforesaid, and after repaying to William L. Price, George F. Stephens, and Joseph Fels the amount originally advanced by them for the purchase of said land from David P. Derrickson, who made title therefor, to George F. Stephens by deed dated June 12, A. D. 1900 and recorded in the Recorders Office at Wilmington in the State of Delaware in Deed Record G., Vol. 18, page 345 etc., to devote the purchase money to such purpose as shall be approved by said trustees.

"And the said trustees shall have power, subject to the approval of a majority of the residents, to supply all vacancies which may occur in their number, which it is intended shall always be and continue to be three, it being expressly hereby provided that upon all questions requiring the exercise of discretion on the part of the trustees, the action of a majority, after an opportunity has been given to all to express their opinions shall be valid and binding upon all."

It is to be observed that by this restatement of the terms of the trust, the trustees voluntarily sheared the broad powers theretofore existing in them to a considerable extent.

After the adoption of the constitution and by-laws, assessors made the yearly assessments of rentals as they were required to do under those documents. The trustees accepted the assessments of rentals thus made and apparently recognized them as final. At all events, they took no formal action in the way of adopting the assessments as their own. In February, 1924, however, the trustees were advised by their counsel that the assessment of rentals is a primary duty of the trustees, that it could not be delegated to others, and that the method of assessment theretofore in force could be continued only in the form of a recommen-

dation to the trustees who might specifically confirm the assessment as their own act.

This opinion was promptly communicated to the Arden-folk by the trustees, who stated in their communication that in the future the procedure in the matter of assessing rentals would be, (1) the town meeting should continue to elect assessors, (2) the town clerk should notify the trustees of the names of the persons elected as assessors, (3) the assessors should assess the rentals as in the past, (4) they should report the assessments in the form of a recommendation, and (5) the trustees would thereupon act upon the recommendation and transmit to the next succeeding town meeting a copy of the report of the assessors together with the trustees' action thereon.

The present controversy germinates from the new procedure which the trustees undertook thus to lay down in February, 1924.

The answer denies that the communication was accepted by the town meeting as the bill alleges. On the contrary it avers that upon vote of the town meeting it was rejected.

No difficulties arose, however, between the trustees and the leaseholders until 1934. From 1924 to 1933 the trustees approved of the rental assessments as made by the assessors and adopted them as their own. For the fiscal year beginning March 25, 1932, the assessors reduced the rentals by ten per cent. and the trustees accepted that reduction.

For the fiscal year beginning March 25, 1934, the assessors made a further reduction of ten per cent. in the rentals. The trustees refused to confirm this reduction and informed the town meeting that the rentals would be at the rate of assessment prevailing during the preceding fiscal year.

Thereafter on April 28, 1934, a group of the residents and leaseholders assembled in a town meeting and protested the action of the trustees. They unanimously passed the following resolution:

"Whereas, the lease covering lands in Arden provides for the assessment of land rentals subject to appeal to a meeting of the residents of the community; and

"Whereas, the duly elected Assessors of Arden have submitted an assessment of all land rents for the year 1934 which was duly approved by the Town Meeting held in August, 1933; and

"Whereas, the Trustees of Arden have refused to abide by the assessment recommended and approved as hereinbefore stated; and

"Whereas, the said Trustees have by their prior attitude and particularly by their present actions flagrantly violated the wishes of the Residents of Arden as expressed by a majority decision of the Town Meeting; and

"Whereas, it is the opinion of this Town Meeting that the actions of the Trustees on all matters of communal importance should strictly follow as mandatory the decisions of the Town Meeting; and

"Whereas, the Court of Chancery has made a recent interpretation of the Deed of Trust similar to ours,

"Now, be it therefore resolved, that the Town Meeting hereby designate a committee of five (to be bonded) for the purpose of receiving in trust all rentals due for the year March 25, 1934, in advance, which funds are to be retained by such committee until such time as the Trustees will agree in writing that they will abide and comply with all decisions by a majority of the Town Meeting;

"Be it further resolved, that the said committee of five shall constitute the authorized representatives with whom the Trustees may confer for the purpose of carrying out above resolutions."

A committee consisting of all the defendants was selected by the meeting to execute the provisions of the resolution.

Thereafter the complainants, trustees, filed their bill, charging the defendants with a purpose to usurp the rights and powers of the complainants as trustees of Arden and praying an injunction restraining the defendants from collecting, etc., any rentals and from usurping the powers and duties of the complainant trustees. The bill also prays an accounting for any moneys which the defendants may have received in the course of acting under said resolution.

By their answer, the defendants admit they compose a committee as alleged by the bill, but deny that they have collected or attempted to collect any rentals or that they have threatened to do so. On the contrary they aver that they do not intend to collect or receive, or to threaten to collect or receive, any of the rentals.

If the motion for a decree notwithstanding an answer were the only matter before the court for decision, it would be denied. This is for the reason that the positive repudiation of the charge that the defendants are intending to do the things which are sought to be enjoined would make it improper on such a motion to decree an injunction against them. Evidently, though the defendants at one time seriously considered taking action to carry out what I am bound to say is a rather bold resolution, later and cooler counsel restraining their impetuosity.

While the motion for a decree could thus be speedily disposed of, the demurrer to the cross-bill, however, makes it necessary to enter somewhat at large upon a consideration of the questions which are presented by the pleadings and by the arguments advanced at the bar and on the briefs.

It is to be observed, first, that the resolutions of the town meeting, above quoted, are in error in that one of the paragraphs of the recitals where it is stated that this court has made a recent interpretation of "the deed of trust similar to ours," if thereby it is meant to say that any interpretation has been made of a similar trust deed in any way involving such a question as the resolutions deal with. The reference evidently is to the case of *Cannon v. Stephens, et al.*, reported in 18 *Del. Ch.* 276, 159 *A.* 234, where a question arose under the trust deed governing Ardentown, a neighboring colony to Arden. The only observation in the opinion filed in that case which is of pertinency here is the one quoted from *Murphy v. Delano*, 95 *Me.* 229, 49 *A.* 1053, 1055, 55 *L. R. A.* 727, to the effect that the trust, whatever it is, "constitutes the charter of the trustee's powers and duties. From it he derives the rule of his conduct. It pre-

scribes the extent and limits of his authority." That principle is applicable here in measuring the extent of the duties and powers of the complainants as trustees. In the obverse it is equally applicable to the rights and privileges of the defendant leaseholders as *cestuis que trustent*. The charter of their rights and privileges is likewise the trust, in whatever form its provisions are evidenced.

The trust is a charitable one. The cases defining and dealing with charitable trusts in this State are *Griffith v. State*, 2 *Del. Ch.* 421, affirming *State v. Griffith*, 2 *Del. Ch.* 392; *Doughten v. Vandever*, 5 *Del. Ch.* 51; *Trustees of New Castle Common v. Megginson*, 1 *Boyce* 361, 77 *A.* 565, *Ann. Cas.* 1914*A*, 1207. It is not deemed necessary to review those cases and to extract from them excerpts defining the general character of purpose which the law will sustain as the proper concern of a public charity. In the instant case the trust possesses the requisite extensiveness and indefiniteness of beneficiaries to meet one of the primary tests of a charity. The objects it was created to promote are in one sense that of the material welfare of its beneficiaries and in another the educational purpose of demonstrating by practical experiment the workability and desirability of the single tax theory as a method of raising revenues for community support. The latter object is not so plain as the former. I think, however, it may be fairly stated as one of the objects which the founders of Arden intended should be secured by the trust which they created.

That the material welfare of the public or any portion thereof is a proper subject for the concern of a charity, is settled. A trust which is designed in the interest of the education of the public along lines which are not an offense to public policy, likewise is within the permissible objects which a charity may promote. In the case of *George, et al., v. Braddock*, 45 *N. J. Eq.* 757, 18 *A.* 881, 6 *L. R. A.* 511, 14 *Am. St. Rep.* 754, a gift in trust for the purpose of circulating the works of Henry George throughout the United States in order particularly that his theories on taxation

might be disseminated, was upheld as a charitable trust. Education may be by precept and example as well as by the printed word. If so, in so far as the experiment at Arden was motivated by a purpose to educate the public by concrete demonstration to accept and practice the George theory of the single tax, the trust in the instant case becomes exactly analagous to the gift which was sustained by the Court of Errors and Appeals of New Jersey as a valid charitable trust. In *Peth, et al., v. Spear, et al.,* 63 *Wash.* 291, 115 *P.* 164, it is expressly ruled by the Supreme Court of Washington that a trust which is designed to teach socialism by a practical demonstration of its operation in a community which the trust is to establish and manage, is educational in nature, and valid as a charity.

The trust in this case is a public charity. Where are its terms evidenced? On this question the parties are in disagreement. The defendants contend that the terms of the trust are to be found in the deed of 1901, in the constitution and by-laws, and in the deed of 1908. The complainants contend that the deed of 1908 is now the sole repository of the trust's terms.

The trust at first was of course defined solely by the deed of 1901. That deed, as before observed, gave the trustees very broad and arbitrary powers. Under it the trustees could permit the land to be occupied under such provisions, restrictions, limitations, conditions, charges and arrangements as they should from time to time make with full power to change, alter or amend any such provisions, arrangements and limitations. Now it is averred in the answer and alleged in the cross-bill, and for the present purposes admitted, that these powers in their broad sweep had a retarding and stunting influence upon the growth of the community, and in order to counteract the effect of the fear which their ominous appearance inspired in the breasts of prospective colonizers, the constitution and by-laws were adopted in 1905. It is said by the defendants that the

trustees accepted the constitution and by-laws and thereby wrote their provisions into the terms of the trust. To this contention, two observations are pertinent. The first is, that the constitution and by-laws on the face of their own recitals show that the persons who adopted them were the lease-holders and residents. No mention is made of the trustees. The second observation is that nowhere in the constitution and by-laws is there any pretense at modifying the terms of the trust as the same are defined in the deed of 1901. That deed remained in full force and effect according to its terms. Granting then that the trustees by their acts *in pais* accepted the constitution and by-laws, as the defendants contend, yet they continued to possess, by virtue of the deed of 1901 the power later to change, alter or amend whatever provisions, arrangements or limitations the constitution and by-laws may have assumed to impose. This power to change, etc., as defined in the trust deed of 1901 was not undertaken to be surrendered anywhere in the constitution and by-laws. In fact the constitution and by-laws appear to have been devised for the government of the village as a community rather than for an expression of conditions on which the trust was held by the trustees. The restating or revamping of the trust itself, as distinguished from the matter of community administration which the constitution and by-laws were to settle, was among the agenda that the committee of 1905 was charged with the duty of considering. Having completed the business of the constitution and by-laws, the other matter of the restating of the trust remained to be accomplished. It was in fact completed in 1908 and is reflected in the deed of that year. Thus it appears quite clearly that in the contemplation of the interested parties, the constitution and by-laws was one thing and the alteration of the fundamental trust was another. This thought emphasizes the view that whatever was the attitude of the trustees towards the constitution and by-laws, the trust powers as originally defined in 1901 were not altered or changed thereby.

The trustees then were in no wise restrained by anything in the constitution and by-laws from exercising the power which they did in 1908 to restate and define the terms of the trust. They did this by the deed of 1908. That deed declared that they held the lands "upon the following trusts and *upon them only.*" At an earlier point in this opinion the trusts as defined in 1908 are quoted and there is no occasion to repeat them.

I conclude that the deed of 1908 is the sole expression of the trust. It supplants the definition of the terms of the trust as found in the deed of 1901, and if the constitution and by-laws could be said in any way to contain any self-imposed restrictions upon the trustees, which does not in fact appear to be the case, such self-imposed restraint, being itself alterable under the deed of 1901, if it is in conflict with the deed of 1908, has been removed by that deed.

The subject with which this case is concerned is that of leases and the rentals payable thereunder. The deed of 1908 which is the sole expression of the trust's terms, empowers the trustees to make leases, "the lease in each case to reserve, as rental, the full rental value of the premises demised by the lease." Excepting for the first year, the leases held by the defendants do not express the full rental value in terms of dollars. The full rental value is left by the language of the lease to be determined annually by the assessors, and the annual amount which the assessors fix as such full rental value is the amount which the leaseholder obligates himself to pay. That is the contract. Unless the contract is an invalid one, the trustees certainly cannot demand more than the assessors fix.

The contract in this particular is, however, invalid, say the complainants, because it amounts to a delegation by the trustees of the primary duty resting upon them as trustees to fix the terms of the leases, among which the rate of rental is a fundamental and an essential feature. The defendants make answer to this contention by suggesting that the terms of the trust as found in the other documents

preceding the 1908 deed, viz., the constitution and by-laws, permit such a so-called delegation of power. For the reasons already stated, those other documents form no part of the trust's definitions. The deed of 1908 is the sole repository of the trust's terms. The answer to the complainants' contention just stated, is not, then, sufficient.

But there is another answer which appears to me to be conclusive against the complainants' contention. It follows.

It cannot be doubted that the general rule forbids a trustee from delegating to another the performance of the duties resting upon him which involve the exercise of discretion. Citation of authority is not needed to support that proposition. But the case is not disposed of by stopping with that proposition.

This is a charitable trust. Courts are disposed to greater liberality in dealing with trusts of that character than with trusts of a purely private nature. The true test for the guidance of the court in passing upon the sort of permissible conduct in which the trustees of a charity may engage in the course of administering the trust, is first, the objects sought to be promoted and the reasonableness of the means adopted for their most efficacious accomplishment. Where the purposes are necessarily general and the methods of promoting them are to be ingeniously invented, it may well be that in the interest of the trust's successful operation some of those rules which have been accepted as necessary for the protection of the ordinary trust ought to be relaxed. If they defeat the very end which they are designed to serve, viz., the welfare of the trust, a strict adherence to their letter can hardly be defended.

After all, the rule for the trustees' guidance and for the court's, is expressed in the question—what is most beneficial to the trust? This test is applied in the law of private trusts when the question of the reasonableness of a lease in the matter of its duration has come before the courts for review. *Hill on Trustees*, (*2d Ed.*) 707. It has also been

applied in the law applicable to trusts for charitable uses where the duration of the term of a lease has come before courts for review. *City of Richmond v. Davis*, 103 *Ind.* 449, 3 *N. E.* 130; *Trustees v. Board of Education*, 26 *S. W.* 187, 16 *Ky. Law Rep.* 51.

Speaking of leases made by trustees of a charity, Bogert, in the 4th volume of his work on the *Law of Trusts and Trustees,* § 793, *p.* 2301, says: "Whether the power to lease be expressed or implied, the lease must be reasonable and for the benefit of the charity."

Are the leases held by the defendants and other lease-holders in Arden reasonable and for the benefit of the charity? That is the crucial question.

It is to be answered in the light of the purposes sought to be accomplished by the trust and the circumstances of fact and human nature with which the trustees had to deal in their attempt to effectuate those purposes. They held land upon which they were to establish a village in which the taxation theories of Henry George should be put in practice as far as possible. No resident was to own his land. He was to be a leaseholder, and was expected to expend money in the erection of improvements upon the demised premises. The leases, it is assumed, would require to be long term leases. The rentals which the leaseholders paid annually would be based on the full rental value of the land. Nothing was to be taxed or charged on the improvements. The theory of taxation which the community was to apply exempted all improvements from public charges. The trustees tried out the plan of making leases in which, it was thought, the rental value of the land would be left in their control from time to time and from year to year. That plan was not workable. Only a few persons would join the colony and lay out money upon improvements under leases that left them in such a state of uncertainty and insecurity and the potential victims of the arbitrary will of the trustees in the matter of future rental obligations.

The community was in danger of death at its birth, and the purpose sought by the trust to be realized was in danger of complete frustration. The trouble was with the form of the leases. A new form more attractive to possible settlers was apparently an absolute necessity unless the project of a village practicing the single tax theory was to be abandoned and the trust terminated.

Now in those circumstances it seems quite reasonable that a form of lease should be drafted which would give future leaseholders protection against unreasonable rentals. If such leases were offered, the village might hope to grow. Such new form, the one here under examination was adopted. The sequel proves that the new type of lease met the needs and purposes of the trust, because after it was offered to prospective residents the village began to grow and the experiment which the trust was designed to promote apparently went forward at a vigorous pace. The leaseholders from that time on, much as the citizens of an incorporated town, had protection through popularly elected assessors against apprehended over-charges for rental. The trustees by the contract of lease stipulated that they would abide by this arrangement. I do not see how it can be said that the arrangement was an unreasonable or improvident one from the view point of the trust. Indeed so far is the opposite true, that it does not seem out of the way to say that but for the arrangement the purpose of the trust would have entirely failed.

Let the matter be put in this way. The trustees say to a negotiating leaseholder, "Take this lease at an uncertain annual rental which will be fixed by the measure of the full rental value of the land." The prospect says, "Well if I do, and lay out money in buildings, how much a year will that full rental value amount to?" The trustees reply, "We do not now know. We, the trustees will fix it each year during the long life of the lease." To which the prospect responds, "That is too indefinite for me. If you agree to let assessors elected by the entire community be the arbi-

trators who will adjudge between us as to what is the full rental value, I will agree to pay that amount if you will agree to accept it."

Now that in substance is what happened in the case of each lease transaction. The annual rental being uncertain due to the particular doctrines of the community, it is difficult to see how any other sort of lease could be devised which would harmonize the operations of the trust with the personal considerations of the prospective residents. The lease in one sense does not delegate the discretionary powers of the trustees. They exercised their discretion in approving the terms. Among those terms was one providing in effect for arbitrators to render certain from time to time that which in the nature of things the parties could not at the moment render certain for the indefinite future.

In view of the peculiar nature of the trust and in view of the fact that in the interest of its promotion leases were necessary to be devised in such form as would meet, not the requirements of profit as in the ordinary lease, but the unusual and rather extraordinary considerations which inhered in the experiment, the scheme set up in the leases for ascertaining the rentals does not appear to be such a delegation of discretionary powers by the trustees as equity should strike down. "Rental" as used in the lease could quite appropriately be called an annual tax for the support of the village government. If the trustees had devised a scheme of colonizing the land and provided therein for the collection of taxes for public use ascertained by assessors as are these rentals, it would seem plain that the scheme would in no way transgress their powers. The essential character of the rental being that of a tax, there is nothing unreasonable in leaving its annual ascertainment to assessors chosen by the community to determine.

The leases are valid. But should this court grant the prayer of the cross-bill of two of the defendants which seeks to enjoin the complainants from assessing or collecting any rents from leaseholders other than rents established

by the assessors? I think not for the following reasons: (1) The cross-complainants are not entitled to an injunction in behalf of all the leaseholders in the village as prayed. (2) They are not entitled to an injunction in behalf of themselves, because they have an adequate remedy at law by way of defending against a demand for more rent than is due under the lease. (3) The cross-bill is not germane to the original bill. The original bill seeks to enjoin the defendants from usurping or interfering with the duties of the trustees. It does not seek to collect rents from the defendants. When two of the defendants seek in response to such a bill to secure an adjudication of what rent is due and to enjoin the collection of more, they introduce an element of controversy which is new and not relevant or germane to that which the original bill introduces.

The motion for decree notwithstanding answer will be denied and the demurrer to the cross-bill will be sustained.

Order accordingly.