JEAN W. BROEKER, CHESTER F. LIGHTBOWN, and SYLVAN N. LEVY, SR.,

*vs.*

HAMILTON D. WARE and WILLIAM P. WORTHINGTON, Acting Surviving Trustees of Arden.

*New Castle, December 19, 1942.*

*James R. Morford,* of the firm of Marvel & Morford, for complainants.

*William Poole,* (*J. Claude Bedford,* of Philadelphia, Pa., of counsel), for defendants.

HARRINGTON, CHANCELLOR: By deed dated October 17th, 1901, George F. Stephens conveyed about 162 acres of land, in Brandywine Hundred, New Castle County, constituting what is now known as the Village of Arden, to William L. Price, Frank Martin and George F. Stephens, upon certain trusts, the terms of which need not be stated. The pro-

visions of that deed proved to be inadequate to carry out the intent of the founder, and, on January 31st, 1908, a second trust indenture was executed and delivered by George F. Stephens, the original grantor, to the original grantees. That deed recited that "the said conveyance of land (the original conveyance) was made upon certain trusts, which it is desired by the parties aforesaid to restate and amend." The original deed authorized amendments. The deed of January 31st, 1908, in part, then provided:

"The said lands are hereby declared to be held by the said William L. Price, Frank Martin and George F. Stephens upon the following trusts and upon them only."

The trust provisions of that deed were:

* * * "to lease such portions of said land as may seem good to the said trustees and their successors, to such persons and for such terms as they the said trustees shall determine, the lease in each case to reserve, as rent, the full rental value of the premises demised by said lease; to pay all state and local· taxes out of and from the rents received so far as these suffice to suffer all persons to whom land shall · be leased as aforesaid, who constitute a community so long as they continue such lessees, to enjoy and use for common purposes such of the lands which are the subjects of this deed as the trustees aforesaid shall not have demised to individuals or devoted to purposes other than common; to apply all sums of money received as rents, in excess of the amount needed for the purposes of paying the taxes, to such common uses desired by a majority of the residents as in the judgment of the trustees, are properly public, in that they cannot be left to individuals without giving one an advantage over others; * * *

"And the said trustees shall have power, subject to the approval of a majority of the residents, to supply all vacancies which may occur in their number, which it is intended shall always be and continue to be three; it being expressly hereby provided that upon all questions requiring the exercise of discretion on the part of the trustees, the action of a majority, after an opportunity has been given to all to express their opinions shall be valid and binding upon all."

No resident of the community was to own a lot; he was to be a mere leaseholder, though in most cases, the lessees were apparently expected to spend money in the erection of improvements on the demised premises. It is

said that the apparent purpose of the trust was to found a village or community, in which small industries and crafts, conducted by people in moderate financial circumstances, would be encouraged, and, so far as practicable under existing laws, to adopt the system of land tenure and taxation, advocated by Henry George, and known as the "Single Tax." The contention is emphasized that the community was thus intended to demonstrate, in a practical way, the operation of the Single Tax theory, which its well known originator had advocated in his book, entitled "Progress and Poverty." The administration of a charitable trust is involved (*Ross v. Freeman*, 21 *Del. Ch.* 44, 180 *A.* 527), but we are not directly concerned with these questions.

In addition to the direction that "the full rental value" of any land demised shall be reserved by the trustees, perhaps the most pertinent provisions of the trust deed of 1908 are that the trustees:

(1) Shall suffer and permit the community of Arden "to enjoy and use for common purposes such of the lands as are the subject of this deed as the Trustees * * * shall not have demised to individuals, or devoted to purposes other than common."

(2) That they shall "apply all sums of money received as rents, in excess of the amounts needed for the purpose of paying the taxes, to such common uses desired by a majority of the residents as in the judgment of the Trustees are properly public, in that they cannot be left to individuals without giving one an advantage over others."

(3) That they "shall have power, subject to the approval of the majority of the residents, to supply all vacancies which may occur in their number, which it is intended shall always be and continue to be three."

Hamilton D. Ware, one of the defendants, serving as a successor trustee, has been a resident of Arden since 1902; he is a leaseholder of the town, and became a trustee September 2nd, 1927. The validity of his election is not disputed. William P. Worthington, the other defendant, who is likewise serving as a successor trustee, was elected November 5th, 1927. He was a resident of Arden from

1911 to 1934, at which time he moved to Summitt, New Jersey. Edwin S. Ross became a trustee May 4th, 1931; he died December 23rd, 1937. The vacancy caused by his death has never been filled by the trustees, but, by agreement, a temporary trustee was appointed by this court, after the complainants' bill had been filed.

The primary questions before the master, and presented by the numerous exceptions filed to his report, are:

(1) Shall the Chancellor appoint a permanent trustee to fill the vacancy caused by the death of Edwin S. Ross?

(2) Shall the Chancellor remove William P. Worthington as trustee, because he was not validly chosen, and appoint a trustee in his place?

(3) Shall William P. Worthington and Hamilton D. Ware, or either of them, be removed because of their alleged misconduct in office, and new trustees appointed?

(4) Shall the defendants, Worthington and Ware, be directed to account for, and pay to the Arden Trust $4,305.-97, or any part thereof, plus interest, alleged to have been disbursed by them in violation of the provisions of the trust deed?

Various subordinate questions are also involved in the consideration of those questions. With one exception, the master answered all questions in the negative, and recommended that all relief sought by the complainants be refused. Some of his conclusions merely involved questions of fact, which are fully analyzed in his report; others involved the consideration and determination of whether the proven facts justified the application of certain well-settled principles of law; still others related to the meaning of the trust deed, and the rights and duties given thereby, both to the trustees and to the residents of Arden. The master correctly found the deed contemplated that there should always be three

trustees; and, because of the inability of the surviving trustees and the residents to agree on a person, in a manner provided for in the deed, recommended that a permanent trustee be appointed by this court to fill the vacancy caused by the death of Edwin S. Ross in December of 1937. The complainants concede the inherent power of the court of equity to appoint a successor trustee under such circumstances. *State v. Griffith*, 2 *Del. Ch.* 392; *Griffith v. State*, 2 *Del. Ch.* 421; 1 *Scott on Trusts*, §§ 108, 108.2. They concede that a court of equity will not permit a trust to fail for the lack of a trustee (*Hutton v. St. Paul Brotherhood*, 20 *Del. Ch.* 413, 178 *A.* 584; *Trustees of New Castle Common v. Megginson*, 1 *Boyce* 361, 77 *A.* 565, *Ann. Cas.* 1914 *A*, 1207; 1 *Scott on Trusts*, § 108) ; and that a successor trustee may be appointed without the approval of the *cestuis que trust*. 1 *Scott on Trusts*, § 108.2; 3 *Bogert on Trusts and Trustees*, § 532; *In re Pitney*, 113 *App. Div.* 845, 99 *N. Y. S.* 588.

In view of the express powers given to the residents of Arden, in the selection of successor trustees, the complainants, nevertheless, request that before any appointment is made by this court, the residents be permitted to express their approval of the contemplated appointee by a town-meeting vote. They claim that this is the customary method of deciding local problems. But the master found that any such procedure with respect to the appointment of a new trustee by this court would be wholly impracticable; this was, largely, because of the apparent inaccuracy of the town records of qualified voters. Independent of any other considerations, that is a sufficient reason for denying the complainants' request.

The validity of the selection of William P. Worthington as trustee was attacked on two grounds, (1) that his nomination was not approved by a town-meeting vote, in accordance with the by-laws of the Town of Arden; and (2) that his selection did not receive the approval of a majority of

the residents. The master rejected both contentions. He correctly found that the complainants had not shown that Worthington's election was invalid, and recommended that no decree for his removal be ordered on that ground.

The trust deed of 1908 may not be as explicit, in all respects, as might be desired, but it must be regarded as the charter, which governs the rights and powers of all persons interested in the charitable trust created thereby. *Ross v. Freeman, supra.* It prescribes the extent of the duties and powers of both the trustees and the *cestuis que trust;* and it is the duty of this court to ascertain its real intended meaning, with respect to the questions involved in this controversy.

The complainants claim that the only appropriate method of procuring the assent of the residents of Arden, in the selection of a trustee, or otherwise, is by a majority vote of those present at a town-meeting, regularly held pursuant to certain by-laws passed by the residents. Their theory is that, applying democratic principles, persons present at such meetings represent all of the residents, and can bind them accordingly. The holding of town-meetings for the discussion of various local problems, has been customary at Arden since an early date in its history. But the specific by-law relating to the approval of the nomination of a trustee to fill a vacancy, was not made until some time between 1931 and 1939; the one relating to the approval of contemplated expenditures by the trustees appears in the 1939 revision of the by-laws, and may have been made prior to 1938. But any consideration of these town regulations is unimportant; even if made by the residents at appropriate times, they cannot limit the language of the trust provisions of the deed of 1908. That instrument merely contains the general provision that the selection of a trustee shall be "subject to the approval of a majority of the residents of Arden." Any such restricted by-law, as is relied on by the complainants in support of their contention that Worthing-

ton's selection was invalid because not approved by a town-meeting vote, would be wholly inconsistent therewith. The mode of expressing the desire of the required number of residents with respect to expenditures for common uses of a public nature, is phrased in equally general language. While in the absence of any contrary provision, the consent of adult residents could only have been contemplated, the adoption of any reasonably fair and accurate method of procuring it would be within the meaning of the general language of the trust deed. The approval of any nomination made by the trustees, indicated by a fair town-meeting vote of the number of residents required, would seem to be within its scope; but the required consent cannot be limited to that method. The approval of the proper number of residents, indicated by their signatures, attached to an appropriate petition, is an equally proper procedure.

In considering the effect of a town-meeting vote, it may be pertinent to point out that the master found that the usual attendance at such meetings represented a small minority of the adult residents of the town. Moreover, the by-laws now in force permit residents over eighteen years of age, and non-resident leaseholders to vote. Such regulations are inconsistent with the provisions of the deed, and no alleged acquiescence of the trustees, in principle, can be regarded as of any importance. Conceding that some liberality of construction is frequently indulged in when charitable trusts are involved (*Ross v. Freeman, supra*), there are limitations on that rule. Applying these principles, the approval of Worthington's selection as a trustee by the circulation of a petition, was entirely proper.

The second contention, relating to the validity of Worthington's selection, was purely a factual one. It involved the determination of whether the signatures of 136 persons to a petition, approving his selection, represented a majority of the residents of Arden on November 5th, 1927. The evidence supports the master's conclusion that it did

not clearly appear that 136 persons were not then a majority of the residents. He found that the complainants had not sustained the burden of proof resting on them.

The removal of the defendants for alleged misconduct in the performance of their duties as trustees, was sought on eight grounds:

(1) For failure to fill the vacancy caused by the death of Edwin S. Ross, in December of 1937.

(2) Favoritism shown to certain leaseholders, in administering the trust.

(3) The improper delegations of their duties as trustees, to their clerk.

(4) The management of Ware's delinquent rent account.

(5) Worthington's continued non-residence, and other business activities, and Ware's usual absence from town approximately five days a week.

(6) The loss of confidence in the trustees by the residents of the town.

(7) Forcing the use of new lease forms.

(8) Expenditures made by the trustees in violation of the trust deed.

The master found that none of these charges had been proved, and refused to recommend their removal. The trustees were bound to initiate the proper steps to fill the vacancy caused by the death of Mr. Ross, but no flagrant breach of duty appears. They made repeated efforts to fill that vacancy, but, for various reasons, without success.

Some delay in making a selection would be expected; theoretical and practical differences in town management, and other controversial matters, were perhaps involved;

neither the trustees nor the residents could force the appointment of a trustee, without the consent of the other. A number of persons were considered by the trustees, and several were offered the nomination, but for various reasons, after some consideration, refused it. No less than three were actually nominated, and their names submitted to the residents. One received the requisite approval, but, before he had qualified as a trustee, procured a position elsewhere; with his consent, his name was, therefore, withdrawn. A grandson of the well-known economist, and a practicing physician in the City of Wilmington, was finally nominated, and petitions for the approval of his selection were being circulated among the residents when the bill was filed, and further proceedings were stopped. The election of one person seems to have been pressed by a majority of the residents some months after the vacancy occurred, but for various fundamental reasons which need not be considered, he was not satisfactory to the trustees. No failure to perform their duties appears.

The conclusion that no favoritism was shown to any leaseholder by the trustees in the collection of rents, or otherwise, is justified.

It seems unnecessary to consider the charges that a small amount of firewood was given to some favorite individuals, including Ware; that certain drainage work primarily benefited friends or relatives; or that threats were unfairly made to cancel certain leases. No real improper acts were proved.

Ordinarily, the trustees are bound to collect all rents due, if reasonably possible. They are bound to do all acts necessary for the preservation of the trust estate that would be usually performed by reasonably prudent persons, in the management of their own property, under like circumstances. 3 *Bogert on Trusts and Trustees*, § 582; 2 *Scott on Trusts*, § 192. Whether that is done is a question of fact. 3 *Bogert on Trusts and Trustees*, § 592. When collections

cannot be made otherwise, and there is property from which the claim apparently can be collected, the use of legal process may be sometimes necessary; but there are cases when the exercise of reasonable diligence would justify the acceptance of notes for a portion, or all, of the rent due from a lessee. 2 *Scott on Trusts*, § 177; *Stevens v. Meserve*, 73 *N. H.* 293, 61 *A.* 420, 111 *Am. St. Rep.* 612; 3 *Bogert, supra*, § 592. There may be cases where concessions or compromises will be justified, when reasonably necessary to collect a precarious debt. See 2 *Scott on Trusts*, § 177.

Neither favoritism by the trustees, nor any lack of reasonable effort to perform their duties, would be ordinarily tolerated; but whether that appears in any material degree, is always a question of fact. 3 *Bogert, supra*, § 592. In a few cases where large amounts of rent were due, small reductions may have been made by the trustees, though it did not clearly appear that it was reasonably necessary in order to make the collection. Originally, it seems that by some purported town regulation, the failure to pay rent when due, subjected the lessee to a penalty of 24%; that percentage was subsequently materially reduced from time to time, and when old debts were paid, after the reduced penalties were regarded as in effect, the amount due was always figured on that basis, but no favorite individuals were selected. The charge is unfounded that Worthington received a rebate of $20.00 on his rent in 1928. Applying Single Tax theories, it was then customary to give rebates on rents, in the amount of automobile and mercantile licenses, paid by a lessee, though this custom has been discontinued since 1929. No flagrant abuses of the trustees' powers, which would justify their removal, appear. There is nothing to indicate that the trustees improperly delegated their powers to their clerk. Some administrative details were performed by him, but that is entirely proper. 2 *Scott on Trusts*, § 172.2.

The trustees were not paid officers, and it would be

unreasonable to expect them to personally perform all of the administrative details necessary to the administration of the trust. 3 *Bogert, supra,* § 555; *Van Riper's Estate,* 90 *N. J. Eq.* 217, 107 *A.* 55. All matters requiring the exercise of judgment and discretion were decided by them; no more is required.

Mr. Ware held a lease for a lot in Arden, upon which he did not reside from 1913 to 1934, at which time it was cancelled. In January of 1937, he voluntarily gave the trustees a promissory note, drawn on the Security Trust Company, of Wilmington, for $513.82. Approximately $350.00 of that amount represented unpaid rent; the balance was for penalties on the delayed payments. The note carried no interest. The debt was included in the delinquent rent list for the year 1935, but was omitted from that list from 1936 to 1939, inclusive. It was added as an asset at a trustees' meeting, held April 13th, 1940; this was after the bill had been filed. The town clerk testified that the debt had not been carried on his books as an asset because of an oversight on his part. The amount of the note given, including the penalties, was determined by a former secretary of the trustees. Moreover, while there was a dispute as to whether some of the various auditing committees appointed by the residents of Arden, had seen that note, it appears to have been attached to Ware's ledger sheet in the rent book from the very beginning. The debt seems to have been discussed by the delinquent rent committees, in both 1931 and 1932, but its existence was not criticized by anyone until this suit was brought. Ware owned a furnished home at Arden; a part of the time during the existence of the debt, it was unencumbered, and it seems that there was always a sufficient equity from which it could have been collected. His annual salary as a government employee was $5200. Moreover, he paid the note in full on November 1st, 1940. The transaction was a costly one to him, and the total sum paid, including interest at six per

cent, was $719.34. During the same period, other residents and beneficiaries under the trust were also delinquent in their rents, but Ware was in a very different position. He was a trustee, and his personal transactions with the representatives of the trust should have been above criticism. He was in the position of a delinquent debtor, of an unsecured ·debt, for a considerable time; but it was ultimately paid in full.

Worthington made no effort to collect the Ware debt, prior to the filing of the bill, and because of his negligence in that respect, is likewise subject to some criticism. He too had obligations as a trustee, which he did not attempt to perform.

The removal of a trustee is, however, within the sound discretion of the court. 3 *Bogert on Trusts and Trustees,* § 527; 1 *Scott on Trusts,* § 107; *Massey v. Stout, 4 Del. Ch.* 274. But the power to remove is merely ancillary to its principal duty to see that the trust is properly executed. *Lewin on Trusts,* 492. No bad faith appears, and no loss was suffered by the trust estate. Under the circumstances, the master correctly concluded that the trustees should not be removed for any irregularities shown. *Massey v. Stout, supra;* see also, *Perry on Trusts,* (4th Ed.) 278.

Ware and his family have resided in Arden since 1907. He was formerly in business in Philadelphia, but for the last six years has been employed in Washington. He usually spends the weekends in Arden, and occasionally comes there through the week. His position is such that it is occasionally necessary for him to travel over various parts of the country. But no lack of attention to the performance of his duties as trustee is shown.

Since May of 1934, Worthington has been employed by one of the large life insurance companies as a superintendent of agencies, and has not resided at Arden; but his mother and sister still live there, and he is a frequent visitor. His position requires him to spend approximately one-third

of his time out of his New York office, in traveling over the country. He has attended the trustees' meetings on an average of once a month, over a considerable period of time. There is nothing to indicate that he has failed to perform his duties as a trustee in any material respect because of his non-residence. Mere non-residence is not, in itself, a ground for the removal of a trustee. 3 *Bogert on Trusts and Trustees*, § 527; 65 *C. J.* 618. Whether absence seriously interferes with the performance of his duties is the controlling question.

There is some apparent friction between the trustees and the *cestuis que trust*, over the proper administration of the trust; but it is not of such a nature as to make it impossible for the trustees to properly perform their duties. See *Lewin on Trusts*, 492; 1 *Scott on Trusts*, § 107; *McAllister v. McAllister*, 120 *N. J. Eq.* 407, 184 *A.* 723. Their differences largely relate to the limitations on the rights and powers of each; but mere differences of opinion are not sufficient to justify removal. 3 *Bogert, supra*, § 527. Most of the acts objected to by the complainants occurred before the latter part of 1939, and it may be pertinent to point out that on October 14th of that year a resolution was unanimously passed by a town-meeting vote, expressing full faith in the honesty and integrity of the trustees.

The old leases at Arden provide that after the first year the annual rents payable shall be based on valuations made by the assessors of Arden from time to time. Some, if not all, of them provide for an appeal to the town-meeting from any valuation made. Under the by-laws made by the residents, the assessors were, and are, elected by the registered voters by a town-meeting vote. The evidence shows that the assignment of such leases is permitted; but any new leases made by the trustees, contain slightly different language. They provide for an annual valuation of the leased premises, on which the rent is to be based, but do not state by whom it shall be made. In view of the pro-

vision charging the trustees with the duty of reserving "as rent the full rental value" of the premises demised, the argument that they are arbitrarily and persistently exceeding their authority, in violation of the decision of this court in *Ross v. Freeman, supra,* can hardly be sustained, and the master so held.

Apparently, the only source of income from the corpus of the trust is from rents on the various leases made. Some restriction by the residents on the general right of the trustees to spend that fund is clearly intended, but the scope of that right is the question. The complainants claim that the trustees spent $4,305.97 without authority, and should account for that sum, with interest. Part of the trust property consists of a tract of woodland, which has not been leased; and the deed provides that so long as any portion of the property shall not be devoted to some permissible purposes by the trustees, it shall be used and enjoyed by the community. The greater part of the expenditures objected to relate to that portion of the trust property; though other expenditures, clearly for administrative purposes, are also claimed to be illegal.

The alleged improper expenditures were:

| | |
|---|---|
| Forest Project, including the so-called Memorial Park | $1,203.57 |
| Drainage near the Worthington lot | 65.20 |
| Appraisal fee paid Kurtz & Robertson | 250.00 |
| Legal expenses, including $75.00 paid for an interpretive opinion, after decision in the Ross-Freeman case | 475.00 |
| The Andrews' appraisal | 32.20 |
| Gerstine's salary as Secretary and Clerk | 2,280.00 |
| | $4,305.97 |

Under the terms of the deed, the trustees were to apply all excess rents after the payment of taxes, "to such com-

mon uses desired by a majority of the residents," as they deemed "properly public * * *." The money spent on the woodland and for drainage purposes was for a common use "properly public," within the meaning of that provision. The former expenditures consisted of certain kinds of forestry work, including clearing out fire lanes, removing under growth, dead wood, etc. Some young trees were also planted. The removal of fire hazards and the care and preservation of the trust property were its primary purposes. The project had been considered both by the residents and the trustees for several years, and was expressly recommended by the State Forester. It had been repeatedly discussed at town meetings, and on one occasion a resolution was passed by those present, authorizing Worthington, in his discretion, to carry out the contemplated plan; but it is conceded that the express consent of a majority of the residents was never procured. Apparently, there was an opportunity to carry out the project by W. P. A. labor, though with some cost to the town, and the trustees unfortunately took the responsibility of ordering the work done, without complying with the terms of the deed. Perhaps the final cost was more than had been anticipated; but they did not seek any subsequent approval of their acts. The trust property may have been materially benefited by the expenditures made, but no questions relating to any possible rights because of that fact were before the master or before this court. In view of the express provisions of the deed, the general rule that such expenditures may be made by the trustees, as are reasonably necessary for the care and preservation of the trust property (2 *Scott on Trusts*, § 188; 3 *Bogert on Trusts and Trustees*, 582) does not apply. 2 *Scott on Trusts*, § 188. It is difficult to escape the conclusion that the right to spend was expressly subject to a condition, which was not complied with. Nor is it claimed that any acquiescence on the part of the residents, could be relied on, if pleaded; furthermore, one of the com-

plainants was a non-resident. The master did not find it necessary to determine the exact amount spent on drainage work and on the forest project, but the evidence indicates that it was $1203.57. That sum must be paid to the trust estate by Ware and Worthington, individually. Unless expressly prohibited, the right of the trustees to make such expenditures, as are reasonably necessary for the administration of the trust, is necessarily implied. 3 *Scott on Trusts*, § 382; *Patterson v. Old Dominion Trust Co.*, 156 *Va.* 763, 159 *S. E.* 168; *In re Van Riper's Estate*, 90 *N. J. Eq.* 217, 107 *A.* 55. That rule applies here; the trustees received no salaries, and the trust could not have been properly administered without that right. Some liberality of construction is necessary (see *Ross v. Freeman, supra*); and the power given to spend "all" surplus income, after the payment of taxes, could not have been intended to prohibit reasonable expenditures for administrative purposes. Moreover, the explanatory phrase, "in that they cannot be left to individuals without giving one an advantage over others," shows that the words "common uses" and "properly public" were not intended to relate to expenditures of that nature. Most of them were made long before this controversy arose, and were included in financial reports made by the trustees to town meetings, and in the auditing reports made from time to time, and approved by the residents present at such meetings. All of this is alleged in the answer; but it is unnecessary to consider the question of acquiescence, relied on by the defendants, or any other questions raised.

The exception to the master's finding, that the expenditures made for drainage work and on the forest project were legal and proper, is sustained. The other exceptions are overruled, and the findings of the master relating thereto confirmed.

A decree will be entered accordingly; but the parties will be heard before determining by whom the costs shall be paid, and whether interest shall be added to the amount to be paid by the defendants.