IN THE MATTER OF THE ESTATE OF ISRAEL KORETZKY, DECEASED.

Argued September 12, 1955—Decided October 3, 1955.

See also 33 *N. J. Super.* 530, 111 *A.* 2d 270.

*Mr. Sanford Freedman* argued the cause for the appellant Jack M. Koretzky (*Messrs. Weisman & Freedman,* attorneys).

*Mr. Samuel Kaufman* argued the cause for the respondent Walter T. Margetts, Jr. (*Messrs. John M. Kaufman* and *Andrew L. Kaufman,* on the brief; *Messrs. Bilder, Bilder & Kaufman,* attorneys).

The opinion of the court was delivered by

HEHER, J.   The appeal here concerns an order made by the Chancery Division of the Superior Court dismissing the application of Jack M. Koretzky for the appointment of Julius I. Kislak as co-trustee of a trust created for his benefit by the will of his deceased father, Israel Koretzky, to serve with Walter T. Margetts, Jr., the substituted administrator *cum testamento annexo* and substituted trustee appointed after the removal of the three executors and testamentary trustees, Kislak among them, in the proceedings reported in 8 *N. J.* 506 (1951).

Following the judgment of removal, the executors accounted for their administration and were discharged; and thereupon the substituted administrator and trustee proceeded to administer the estate and the trust.   The estate's liquid assets were in major part used to satisfy estate and inheritance taxes.   The remaining assets consisted of 10 shares of the capital stock of Bright Star Warehouse Company, its entire issue, and 30,600 shares of the outstanding 39,000 shares of capital stock of Bright Star Battery Company.   The latter company, later known as Bright Star Industries, was a manufacturer of flashlights, batteries and kindred appliances.   Its operations were had in buildings of the Warehouse Company. The will bequeathed 60% of the Warehouse Company stock and 20,000 shares of the Battery Company stock to the three designated executors in trust for the testator's son, Jack; and the remaining 40% of the Warehouse Company stock and 10,600 shares of the Battery Company stock were bequeathed to them in separate and equal trusts for the testator's three daughters.   There were provisions for the payment of the *corpus* of each trust to the *cestui* at the age of 40, and for a trust in favor of surviving children in the event of the *cestui's* earlier death, and payment at the age of 21.   The trustees of Jack were given discretion to use the *corpus*, if need be, for his support and education.   The testator's daughters have all reached the age of 40; Jack is now 30 and unmarried.

It is said that during the incumbency of the executors there was an increase of $300,000 in the Battery Company's surplus, but the "change in administration * * * saw a quick decline in the position of the estate and its beneficiaries," and for the years 1952, 1953 and 1954, "the business of the companies showed a rapid collapse," with heavy losses, $600,000 in the three-year period, and all liquid assets "consumed in the payment of taxes, fees and administration expenses," leaving large sums still unpaid; and the result was an order by the Chancery Division of the Superior Court empowering the administrator to enter into negotiations for a sale of the assets and directing that he report thereon to the court, to the end that the outstanding obligations be paid, the administration concluded, and the testamentary trusts established.

Maladministration is not laid to the administrator. The decline in the fortunes of the Battery Company is not attributed to his mismanagement or default. Indeed, it would seem that the decline had set in when the administrator was appointed. In this court's opinion in the earlier proceedings, 8 *N. J.* 506, 522 (1951), Mr. Justice Burling said that the stockholdings in the Battery Company had been "threatened by the weakening of the stability or productive capacity of that corporation, indicated by a rapid decrease of gross profits ($580,000 in 1946; $414,000 in 1947; and $110,000 in 1948) and a similar decline in net profits ($278,854 in 1946; $256,551 in 1947; $67,784 in 1948)."

Jack Koretzky was a director and officer of the Battery and Warehouse companies during the incumbency of the administrator; and the administrator's accountings for the period have been approved, on notice to Jack. There is no occasion now to consider the economic factors which adversely affected the operations of these enterprises. It suffices to say that the administrator was not at fault; there is no suggestion that he be removed from his fiduciary office for incompetence.

Subsequent developments are to be found in the opinion of the Appellate Division reported in 33 *N. J. Super.* 530 (*App. Div.* 1954). The administrator submitted to the court

an offer of $325,000 made by Progressive Industrial Expeditors, Inc., for the assets of the estate. He did not recommend acceptance of the proposal, but his counsel did; and the offer was approved. The *cestuis'* application for an adjournment of ten days because other bids were in prospect was denied. They appealed; and the Appellate Division vacated the order approving the proposed sale and remanded the cause with direction to reopen the bidding.

Meanwhile, notwithstanding his removal as executor and trustee, Kislak interposed on the side of the *cestuis* and through his efforts the assets of the estate were sold, after competitive bidding, to Charles Frost for $440,000. The offer was submitted by Kislak for Frost, supported by a deposit of $250,000. Debts, taxes and estimated allowances chargeable to the estate were roughly $250,000; and a sale of the assets for $325,000 would have yielded but $75,000 for the beneficiaries; at $440,000, the price paid, the amount for distribution will be $215,000, less such allowances as may be made on the administrator's final accounting. Thus, the gain to the *cestuis* through the good offices of Kislak was $115,000.

In their complaint in the present proceeding, filed January 5, 1955, Jack Koretzky and his sister Anne Barash speak of Kislak's "continued concern for and his interest" in them and their sisters, despite what had occurred, and they affirm that "during the years since 1952" Jack had frequently conferred with Kislak and sought his advice "on personal matters as well as those affecting the estate and its administration"; that "if the companies can be continued under family control, the establishment of the trusts under the will" of the deceased "is of primary concern" to Jack since two of his sisters had then reached the age of 40, and the third would arrive at that age in February 1955, and if, on the other hand, it became necessary to sell the capital stock of the Bright Star Companies, "then the amount which may be realized upon such a sale is of vital concern to all the beneficiaries, since their distributive share" would of necessity depend upon the sale price. The complaint then goes on to show

that since the administrator applied for leave to sell the assets of the estate, Kislak's labors in behalf of the *cestuis* had been unremitting; he had devoted the facilities of his "large organization," first, to the proposed financing of family operation of the companies, or, failing that, the sale of the assets of the estate "at the highest possible price," and he had procured the Frost offer of $440,000, later accepted, which was a factor in the vacation by the Appellate Division of the approval of the earlier bid, all this "without charge to the beneficiaries of the estate and without assurance of any award or compensation from them"; also, that Kislak's efforts had reunited the family, "thus healing the cleavage among them which occurred when the removal litigation was instituted." Expressing regret for their early "conflicts and differences" and repentance for the removal action, and voicing the conviction that Kislak "was at all times motivated and influenced only by a sincere and genuine desire to carry out the purposes of the will and to enhance the interests and welfare" of the *cestuis*, the complainants pray that Kislak be appointed "co-administrator and co-trustee to serve in both capacities, together with Mr. Margetts," in the interest of all the beneficiaries, particularly Jack "whose trust continues for an additional period of ten years." It is suggested that Kislak's "long years of experience, his extensive and vast business interests and the sincerity of his purpose in advising and counselling the plaintiffs will be of tremendous benefit to the plaintiffs," and he should now "be restored to the position for which their father designated him, to the end that he may exercise the powers and duties reposed in him under the will."

Since the assets of the estate have now been sold and the time for distribution has arrived, there is no occasion for the appointment of a co-administrator. The trust for the benefit of the co-plaintiff Anne Barash has terminated; and she has no further interest in this proceeding. Only the trust for Jack Koretzky remains to be administered.

It is urged that Judge Grimshaw considered the judgment of removal directed by this court as a bar to the relief sought

here; and this is deemed error. The order denying the application does not reveal the ground of the action; and, while the conclusions later filed express doubt as to the existence of the power, it was found, as a reason conclusive in itself, that the "present trustee, a former treasurer of the State of New Jersey, is completely capable of investing the *corpus* of the trust estate and of managing it during the life of the trust," and no "useful purpose could be served by the addition of a second trustee at this time," and that, assuming the power, absent a "clear and convincing showing that such a course would be for the benefit of the trust estate," the "adverse findings" of this court should not be ignored.

The argument *contra* is that the trust fund is Jack's "only asset from his father's vast holdings"; the "business has passed out of the hands of the family," and he "has no professional or technical background to which he can look for economic security"; he "must rely upon the manner in which this attenuated fund is invested"; the "yield on the *corpus* of the fund, which was once of minor significance while he was in the employ of the Battery Company, today assumes major importance"; he seeks the benefit of Kislak's "long experience" in the "investing field" and "as a successful industrialist, dealing with the properties and capital of investors," thus assuring "the availability of sound business judgment and experience, designed to invest the *corpus* with adequate safeguards under existing law, but yielding at the same time a fair return for Jack's current requirements." And Jack voices gratitude that "the very job" he now holds "with Mr. Frost was secured for him by the intervention of Mr. Kislak with the present owner of the company." And he insists that the "wishes of the primary beneficiary" should be considered. He pays tribute to his father's judgment; and he seeks to make amends for his now regretted demand for Kislak's removal from the trusteeship.

The principle of *res judicata* has no application here. Indeed, the respondent Margetts concedes as much. The appointment of a co-trustee ordinarily involves the exercise of a sound discretion. The question is one of present

fitness and need, in the exercise of Chancery's general juris-
diction to control the administration of trusts. Where it
appears that the settlor intended that the number of the
designated trustees should not be diminished, a new co-
trustee will be appointed to fill the vacancy—by the court
if the method provided by the terms of the trust fails or is
not used; but otherwise the inquiry is whether the desig-
nation of a co-trustee would be more conducive to the proper
administration of the trust. *Scott on Trusts, sections* 108.1,
108.2. See *R. S.* 3:7–67, 68, 69, 70, 72; *R. R.* 4:100–3. And
for applications of the principle, see *In re Battin*, 89 *N. J. Eq.*
144 [*Reprint, p.* 133] (*Ch.* 1916); *Force v. Force*, 57 *A.* 973
(*Ch.* 1904); *Central Trust & Savings Co. v. Walters*, 314 *Pa.*
418, 171 *A.* 890 (*Sup. Ct.* 1934); *Broeker v. Ware*, 27 *Del.*
*Ch.* 8, 29 *A. 2d* 591 (1942); *Oliver v. Poulos*, 312 *Mass.* 188,
44 *N. E. 2d* 1, 142 *A. L. R.* 1094 (*Sup. Jud. Ct.* 1942);
*Wertin v. Wertin*, 217 *Minn.* 51, 13 *N. W. 2d* 749, 151
*A. L. R.* 1302 (*Sup. Ct.* 1944); *Baumer v. Johnstown*
*Trust Co.*, 345 *Pa.* 51, 25 *A. 2d* 723 (*Sup. Ct.* 1942); *Moore*
*v. Bowes*, 8 *Cal. 2d* 162, 64 *P. 2d* 423 (*Sup. Ct.* 1937); also
*Restatement, Trusts, section* 108, *comments b, d* and *e*.

█ And, in the exercise of the power of appointment, the
wishes of the *cestuis que trust* are not controlling. The dis-
cretion thus invoked, while broad, is not arbitrary in nature.
Professor Scott refers, *Ibid., section* 108.2, to a holding by
Lord Justice Turner in a Chancery Appeals case, *In re*
*Tempest, L. R.* 1, *Ch. App.* 485 (1866), that the appointment
of a new trustee is governed by certain general rules and
principles, these among others: first, in selecting a person
for the office, the court will have regard to the wishes of the
author of the trust, expressed in, or plainly deduced from,
the instrument creating it; secondly, the court will not
appoint a person with a view to the interest of some of the
*cestuis*, in opposition to the interests of others; and thirdly,
the court will have regard to the question whether the appoint-
ment will promote or impede the execution of the trust.

█ We are not persuaded that the designation of Kislak as
a co-trustee would be conducive to the better administration

of the trust, and thus the overruling of the petition to that end did not constitute an erroneous exercise of discretion. There has been a radical change in the trust *corpus*. The testator had in view a trusteeship that would require a degree of supervision of his extensive business operations, the care of his investments in business properties and their advantageous disposition should that course become necessary or advisable in the service of the interests of his children, a responsibility calling for varied business skills and experienced judgment; but now these holdings have been converted into money, and the administration of the trust concerns only the investment of these funds in interest-bearing securities sanctioned by law and prudent management. The respondent trustee is a specialist in the field of investment. His qualifications for this service are unquestioned; his integrity is not assailed; there is no suggestion of unfitness, a disqualification that would call for his removal rather than the appointment of a co-trustee; and it is not made to appear that the proposed co-trustee could be of aid in the performance of this function; indeed, differing views could impede the due administration of the trust. We do not know that such would be the case; but we are not shown that the proposed dual authority would be conducive to a more effective administration of the trust. And such being the case, the appellant *cestui,* no matter how laudable his motive and purpose, has failed to show the need justifying the exercise of the power.

Affirmed.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6

*For reversal*—Justice WACHENFELD—1.