# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3010-19

S.D.,

    Plaintiff-Respondent,

v.

D.M.,

    Defendant-Appellant.

_____

Argued September 15, 2021 – Decided October 15, 2021

Before Judges Accurso and Enright.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Salem County, Docket No. FD-17-0587-11.

David T. Garnes argued the cause for appellant.

D. Ryan Nussey argued the cause for respondent (Klineburger and Nussey, attorneys; D. Ryan Nussey and Carolyn G. Labin, on the brief).

PER CURIAM

In this non-dissolution matter, defendant D.M.[1] appeals from the December 13, 2019 and February 14, 2020 orders addressing custody and parenting time issues related to the parties' son, M.M. (Mark). The December 2019 order temporarily granted plaintiff S.D. sole legal and physical custody of Mark, and suspended defendant's in-person parenting time. The February 2020 order superseded the December 13 order; designated plaintiff as Mark's parent of primary residence (PPR); and awarded defendant alternating weekend parenting time as the parent of alternate residence (PAR). We affirm the February 14 order. Because defendant conceded at oral argument that the December 13 order is no longer in effect, we discuss it merely to provide context to our decision.

Mark was born in 2008. His parents never married. Pursuant to a 2011 order, plaintiff was designated Mark's PPR and defendant, as the PAR, was awarded parenting time every Thursday starting at 9:00 a.m. until Sunday at 9:00 a.m.

In May 2018, the parties entered into a consent order to jointly share legal and physical custody of Mark. The new custodial arrangement was short-lived.

---

[1] We utilize initials and pseudonyms to protect the confidentiality of the parties and their child. R. 1:38-3(d)(3).

In December 2018, defendant moved to be designated as Mark's PPR, alleging the child was suffering from emotional issues. In response, plaintiff filed a cross motion, seeking to return to the parenting time arrangement that predated the May 2018 consent order. She contended Mark had adjusted poorly to the joint custodial arrangement and had asked to revert to the former parenting schedule.

The parties agreed to submit to a custody evaluation and chose Dr. Katherine Elder as their evaluator. After the evaluation commenced, defendant addressed the trial court at a June 2019 conference and stated he wanted Dr. Elder removed as the joint expert because he believed she was "pro-mom." By then, defendant was self-represented. The judge denied his request and noted the case was "on backlog." The judge stated:

> I want Dr. Elder's report submitted to the court and to the parties no later than July 30th. So, she needs to do . . . whatever it is she needs to do, . . . pronto. And I'm going to have case management schedule this matter for trial in August.

Before the conference concluded, the judge repeated thrice more that the case would be tried in August. Thereafter, the matter was assigned to another judge, Dr. Elder withdrew from the case, and the parties agreed to proceed without a custody evaluation.

A newly-assigned judge conducted another conference in August 2019, by which time defendant had retained new counsel, and the Division of Child Placement and Permanency was investigating allegations plaintiff had abused or neglected Mark. The judge advised the parties he "had recovered some significant records from [the Division], and the attorneys have every right to review them." He further confirmed the attorneys were allowed to review the Division's records earlier that day.

A Division worker also appeared at the August 2019 conference. She testified plaintiff completed co-parenting counseling and that the Division recommended defendant do the same. Further, the worker testified plaintiff and Mark underwent a psychological exam with the Division's expert, "Dr. Barr,"[2] and that defendant was due to meet with Dr. Barr at the end of August. In response to that testimony, the judge stated that once the expert's report was completed, he wanted a copy of it. Neither attorney objected to the request.

Estimating that Dr. Barr would need approximately a month to finish his report, the judge concluded, "I can't schedule this case for trial until November

---

[2] The parties did not supply us with Dr. Barr's first name. Also, it appears the doctor's report was not admitted into evidence during the parties' custody trial, nor did Dr. Barr provide testimony to the trial court.

A-3010-19

at this point." Additionally, the judge informed counsel and the parties that due to his upcoming transfer to the Criminal Part, another judge would try their case.

Following the August conference, plaintiff requested and received an adjournment of a proceeding scheduled for November 2019. The trial court issued a new notice dated November 1, 2019, which stated, in part, "the above . . . matter originally scheduled for HEARING on 11/08/2019 at 8:30 [a.m.] is adjourned. The case has been rescheduled for a HEARING to be held . . . on 12/09/19 at 1:30 [p.m.]."

Shortly before the December 9 hearing, defendant retained new counsel. Approximately four days prior to the December 9 hearing, defendant's attorney asked to adjourn the hearing or to appear by phone. The judge who was assigned to try the case denied counsel's requests. Nonetheless, defendant's attorney failed to appear as ordered or write to the court to explain his absence from the December 9 hearing. The parties and plaintiff's counsel did appear for the hearing. The judge announced that defendant's attorney "was instructed to be here ready to go. Why he is not here, I don't know. He does not have leave of the Superior Court to be absent, so we are proceeding as scheduled." Before continuing with the hearing, however, the judge briefly recessed to allow defendant to contact his attorney. The judge remarked, "[t]his has been

scheduled for a significant period of time.  This child[] is hanging in the balance."

During the recess, defendant called his attorney.  Defendant reported back to the judge that his attorney asked him to seek a postponement of the hearing.  Defendant also stated his attorney "said that the paper [notice] doesn't indicate that this is a trial hearing [but] I was . . . pretty alert that you announced this as a trial hearing."  The judge responded:

> So, what's the court to do when I have an attorney who is told he cannot appear by phone, who makes no arrangements for alternative representation, . . . whose office has represented to this . . . court that that attorney told you to go find another attorney, despite . . . that I don't have one written document from that lawyer . . .. other than an entry of appearance dated December 2, 2019?

Plaintiff's counsel offered to postpone the hearing on the condition that plaintiff enjoy parenting time with Mark.  He explained that plaintiff had not enjoyed parenting time with Mark since "before Thanksgiving," even though she "was supposed to have [Thanksgiving weekend], and then she was supposed to have a week vacation time in December."  Counsel further advised that defendant "won't return the child."  Defendant denied refusing to return Mark to his mother's care, but said Mark had run away twice before and the school contacted him because Mark "refused to go home."  The judge concluded the

parties' shared parenting arrangement had "gone off the rails," so he ordered "[o]n a temporary basis only," that Mark be picked up from school by plaintiff. The judge instructed that the child did "not have veto power," and "[i]f the child attempts to run away, reach out to Dad, reach out to Dad's relatives. Dad, you are ordered to work with the child and get the child back to Mom." Defendant replied he had just been alerted by Mark's school that Mark was "refusing to go back" to his mother's, "like he did last week." The judge remained steadfast, ruling "Mom is going to pick the child up . . . . [and] the child is to be with Mom until Friday. Dad is to have open and liberal reasonable contact via telephone, Skype, iPhone, whatever . . . is . . . reasonable." The judge asked defendant if he understood "this is nothing more than a temporary order to augment the previous order," and that the parties' custody and parenting time issues would be addressed upon their return to court that Friday (December 13, 2019). Defendant confirmed he understood the judge's decision.

The parties and their respective counsel appeared, as ordered, on December 13, at which time the judge learned Mark was not returned to plaintiff's custody, notwithstanding the December 9 order. The trial began, and with the court's permission and plaintiff's consent, defendant played a series of videos he took on December 9 and 10, 2019, showing the child was brought to

different locations to effectuate the judge's temporary custody order. As the judge noted, the videos defendant introduced into evidence demonstrated Mark's repeated refusals to leave his father's vehicle and return to his mother's care.

We need not outline the judge's findings for each video presented. Instead, we note our review of this evidence gives us no reason to disturb his findings. We highlight only a few.

One video from December 9, 2019 showed two State troopers approach defendant's car to effectuate the transfer in custody ordered that day. One trooper was heard reciting a portion of the December 9 order to confirm Mark (eleven years old at the time) "has no veto power" and defendant was "to work with the child so that he is returned to [plaintiff]." The judge found defendant displayed "absolutely atrocious disrespectful" behavior in front of the troopers, that defendant used "wishy-washy" language with Mark, rather than tell the child he "should go with [his] mother" and "the child was smart enough and perceptive enough" to "pick[] up on this." Further, the judge noted the video showed the child "struck" defendant during the encounter, which behavior was "accepted as somewhat acceptable" even though it was "absolutely unacceptable." Also, during the failed custody exchange, the trooper told

defendant that defendant "made no movement out of the car to assist[,]" "no attempt to assist whatsoever" in the custody exchange.

The judge also found that videos from December 10, 2019 showed Mark's maternal aunt trying to encourage Mark to leave his father's car and return to his mother's care. The judge concluded defendant responded to the aunt in "an absolutely inappropriate manner," and went "off the deep end in front of the child" when the aunt referred to "the judge's ruling." Notably, defendant later admitted on cross-examination that he did not punish Mark for refusing to go with his mother on either December 9 or 10, 2019.

When the December 13 hearing concluded, the judge determined he needed to craft an emergent custody and parenting time order. He explained the "multiple videos . . . speak for themselves." The judge found "Dad [was] ordered to work with the child and get the child back to Mom," yet the child had not returned to his mother's custody. Also, the judge concluded defendant was "unwilling to . . . allow parenting time," and was either "unwilling or unable to be a . . . cooperative parent. He is either unwilling or unable to understand or exercise appropriate decorum in front of his child. He is either unwilling or unable to follow court orders to the letter." Acknowledging that the court might "change its opinion and its findings as this matter fully vets," the judge stated,

"I'm not willing to gamble with this child's safety and with this child's wellbeing."  Additionally, the judge remarked:

> This is an [eleven]-year-old who seems to think he rules the roost.  It is clear to this court, for the purposes of this hearing and this decision, that, when he doesn't like things, he runs away, he goes to Dad.  He doesn't like to be disciplined, he doesn't want things happening, he runs away.
>
>         . . . .
>
> That is why the court, on Monday, put in the order — and I'm seeing from the video[s] that it was in vain — that [defendant] is to endeavor to reunite the child with Mom and follow the order.  He has miserably failed in that respect.  The court has zero confidence in his either ability or willingness to obey a court order.
>
>         . . . .
>
> [Defendant] is not to have any face-to-face parenting time.  [Defendant] may have, for periods not to exceed [fifteen] minutes, two days a week, telephone contact, must be supervised by [plaintiff] at all times for that telephone contact.  It will be between the hours of [six] and [seven] on Monday and Thursday.

The hearing continued on January 31 and February 3, 2020.  Despite the several-week hiatus in the trial after December 13, plaintiff's counsel informed the judge at the January 31 hearing that less than four hours before he appeared in court, he received notice defendant had subpoenaed roughly fifteen to twenty witnesses.  Plaintiff's counsel objected to the fact the subpoenas were served

10

mid-trial, arguing this was not to be a "trial [by] ambush" and if he had he been given more notice, he "would have been able to reach out to these people, take a deposition" in the "almost two months since we were here the last time." Defendant's attorney did not deny issuing the subpoenas just prior to the January 31 hearing, but he asked the judge to enforce the subpoenas.

The judge addressed the dispute as follows:

> It is the practice of this court in cases such as this [to hear] whatever witness is here today [and is] . . . ready to go.
>
> And if there is an objection when a witness takes the stand, the court will hear everybody. The fact of the matter is if you have witnesses here today, we'll take each witness one at a time, we'll find out if there's an objection to that witness. We'll get a proffer what that witness is going to testify to.
>
> But today is the day. Everybody knew from the last time we were here today was the day . . . . [W]e're not holding up anything. We have a spillover for later on this afternoon or next week, . . . but today is the day and if the witnesses are not here then shame on whoever sent out subpoenas within the [eleven]th hour.
>
> But we're not . . . holding up anything . . . . we're just going to proceed.

When defendant's counsel noted "none of the witnesses [he subpoenaed] are here" and he wanted "to have the [Division] caseworkers here," but required a protective order, the judge questioned, "Why am I hearing about this the first

11

time ever at a quarter of 2:00 on the day that the court etched in stone over a month ago was our return date?" Further the judge found a "witness would not be necessitated simply to authenticate and testify as to the records unless or until there's an objection." The judge also noted the Division had closed its investigation of plaintiff after concluding allegations of abuse were "not established."[3]

The judge again expressed concern that Mark "has had his life hanging in the balance" and "[i]t's not in the best interest of the child to have any further delay in these actions." Accordingly, the judge repeated that if defendant's "witnesses are not here today, they're not testifying," noting defendant "has been engaged in this for well over a year, [fourteen] months since he filed this matter. There has been significant delay . . . . Some of it has been attributed to the acts or behavior of [defendant]."

As the hearing progressed, defendant's counsel alerted the judge to the fact he had subpoenaed plaintiff's mother, and she was present in the courtroom. Therefore, the judge permitted defendant's attorney to call her to the stand before

---

[3] "An allegation shall be 'not established' if there is not a preponderance of the evidence that a child is an abused or neglected child as defined in N.J.S.A. 9:6-8.21 but evidence indicates that the child was harmed or was placed at risk of harm." N.J. Dep't of Child. & Fams. v. R.R., 454 N.J. Super. 37, 40 (App. Div. 2018) (quoting N.J.A.C. 3A:10-7.3(c)(3)).

defendant's testimony concluded. During the maternal grandmother's testimony, she denied disparaging defendant in front of Mark. She also denied plaintiff abused Mark, but she admitted she saw plaintiff physically discipline Mark with "a smack on the bottom when he would need it" or a "tap" on his face "when he's gotten smart mouthed."

Upon the resumption of defendant's testimony, he acknowledged he was aware that by December 18, 2019, the Division "closed [its] involvement with [plaintiff]" after considering "all [defendant's] allegations and [Mark's] allegations since approximately January of 2019." Yet, he conceded that as recently as January 30, 2020, he called the State police to go to plaintiff's home for a "wellbeing check" on Mark. Defendant further admitted on cross-examination that he did not check with Mark's school, or email any of Mark's teachers to see how the child was doing after he was placed in plaintiff's sole custody. He also agreed with plaintiff's counsel that he would not have known Mark's grades improved after the temporary custody order was entered, but for plaintiff's counsel showing him Mark's grades from the first and second quarter marking periods.

Plaintiff was the last witness to testify. She denied defendant's allegations that she abused Mark but admitted she had, at times, disciplined the child by

giving him "a little smack" "on his butt." She stated she did not leave a mark on him when she did this and had not disciplined Mark in this manner since November 2018. Additionally, plaintiff testified she had given Mark a "little smack" on his face if he was "mouthing off" but never bruised him. She also stated Mark's demeanor and grades improved after the judge temporarily placed him in her sole custody.

When the hearing ended on February 14, the judge issued a comprehensive oral opinion. In assessing the credibility of the parties and plaintiff's mother, the judge initially noted plaintiff testified with "a high level of credibility"; the same was true of plaintiff's mother. On the other hand, the judge stated, "I afford [defendant] very little if no credibility throughout the entirety of his testimony." The judge found defendant "demonstrated absolutely no self-awareness throughout the entirety of his testimony," and that his responses to his attorney appeared

> to be rehearsed, as if he was reciting something that he had memorized. He had a story. He was going to get it out in the order he was going to get it out . . . . regardless of whether it was responsive . . . even with his own attorney.

Additionally, the judge found much of defendant's testimony was based on "an absolute lack of personal knowledge. [Defendant] would have this court

14

issue some incredibly stark orders that would affect the health, safety and welfare of this child based on things that started off with his testi[fying], 'I heard, I read. I was told.'" The judge noted that defendant's credibility was called into question "by the evidence that he presented," and that his videos "were an eye-opener." Further, the judge observed defendant:

> bases everything on what this highly challenged, disturbed, anxiety-ridden little boy has related to him and this court . . . will not put this child through further anxiety.
>
> It would be of absolutely . . . detrimental effect to bring this child in and subject the child to any form of testimony or in-camera hearing. . . . [T]he court is satisfied that this child has a problem with the truth.
>
> There is sufficient evidence that . . . this child has played one parent off against the other. But the court also finds . . . that there is sufficient evidence that [defendant] has actually coached this child as well.
>
> . . . .
>
> [A]nd I direct everyone's attention to D-3 which was a [fifty]-second video of the events as recorded by [defendant] and edited by [defendant].
>
> This was a [fifty]-second video where [defendant] appears . . . to have pressed record once [Mark] was talking about allegations of his mother and grandmother hitting him.
>
> And at one point [Mark] says [the abuse occurred] "[the] other day," and [defendant] coaches him and

> instructs him and uses the term, "Last week." That's chilling. We have a child with emotional issues, anxiety and . . . there is no telling what that type of coaching and redirecting of this child, what kind of effect it has had. It raises the serious question how much coaching . . . like that [occurred] on their way to the doctor's office, the E.R.s, [the Division], the police departments, et cetera.

The judge concluded defendant's parenting style was "feckless and limp" in terms of "asserting his authority" over Mark, and defendant was "not in a position to appropriately parent this child." Importantly, the judge also found "there is no credible evidence to support that [plaintiff] committed any acts of physical abuse on the child."

The judge concluded Mark was a "special needs" child with "significant behavioral . . . and emotional issues" as evidenced by the testimony and videos presented. Moreover, he determined that based on the evidence presented, including Mark's school records, Mark "adjusted well" to being in his mother's sole custody under the December 13 order, whereas "this fifty-fifty [schedule] is not working. It's causing more stress and strain to the child." Accordingly, the judge concluded the parties should continue sharing joint legal custody, plaintiff should remain Mark's PPR, and defendant should enjoy parenting time on alternating weekends from Saturdays at 6 p.m. to Sundays at 6 p.m.

Before concluding the trial, the judge asked the parties to step out of the courtroom to address "something with [defendant's counsel]." At that time, the judge referred to the failure of defendant's counsel to appear at the December 9 hearing, contrary to the court's instructions. The judge stated the failure to appear "was unacceptable," but also noted counsel was "a good attorney . . . . held in very high esteem by this court and in other courts throughout the State." The judge continued:

> I wasn't going to address this before, but . . . one of the sheriff's officers reported that [defendant], I don't know if he was talking to you or your secretary [on December 9 but he] said the judge is - - I see his face getting red. I was very upset.

Defendant's counsel responded, "You communicated that to me, Your Honor," to which the judge replied, "it's in the past." The judge also stated defendant's counsel "maintained a truly dignified and professional demeanor throughout" the rest of the custody proceedings so the judge was "not going to order any sanctions" because "[i]t's over now."

On appeal, defendant raises the following arguments:

I. [THE] TRIAL COURT ERRED IN FINDING THAT THE APPELLANT'S PARENTING-TIME WITH THE MINOR CHILD SHOULD BE SUSPENDED AS IT WAS DETRIMENTAL TO THE BEST INTERESTS OF THE MINOR CHILD.

17

II. [THE] TRIAL COURT ERRED IN SUSPENDING THE APPELLANT'S PARENTING-TIME WITH THE MINOR CHILD PRIOR TO A FULL PLENARY HEARING.

III. [THE] TRIAL COURT ERRED IN CONDUCTING A PLENARY HEARING WITHOUT PROPER NOTICE BEING GIVEN TO THE PARTIES.

IV. [THE] TRIAL COURT ABUSED ITS DISCRETION BY DENYING THE APPELLANT THE ABILITY TO CALL CERTAIN WITNESSES AND PRESENT CERTAIN EVIDENCE AT THE PLENARY HEARING.

V. [THE] TRIAL COURT ABUSED ITS DISCRETION BY NOT CONDUCTING AN IN CAMERA INTERVIEW OF THE MINOR CHILD.

VI. THE TRIAL COURT ERRED IN MAKING A FINDING THAT APPELLANT HAD "COACHED" THE MINOR CHILD.

VII. THE TRIAL COURT ERRED IN IMPOSING RESTRICTIONS ON THE MINOR CHILD'S PATERNAL GRANDPARENTS FROM HAVING FACE-TO-FACE CONTACT WITH THE MINOR CHILD.

VIII. THE TRIAL COURT ERRED BY FINDING THAT THE [DIVISION] FINDING OF "NOT ESTABLISHED" EQUATED TO A FINDING THAT THERE WAS NO ABUSE OF THE MINOR CHILD BY RESPONDENT.

IX. THE TRIAL COURT ERRED [IN] DENYING THE REQUEST TO APPOINT A GUARDIAN-AD-LITEM FOR THE MINOR CHILD.

X.  THE TRIAL COURT ERRED IN ALLOWING INADMISSIBLE HEARSAY FROM AN UNKNOWN SHERIFF'S OFFICER WHO EAVESDROPPED ON THE APPELLANT AND HIS ATTORNEY'S CONVERSATION.  (Not Raised Below).

These arguments are unavailing.

Our review of a trial judge's fact-finding function is limited.  Cesare v. Cesare, 154 N.J. 394, 411 (1998).  A judge's fact-finding is "binding on appeal when supported by adequate, substantial, credible evidence."  Id. at 411-12 (citing Rova Farms Resort, Inc. v. Investors Ins. Co., 65 N.J. 474, 484 (1974)).  "Because of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding."  Id. at 413.  "Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'"  Id. at 412 (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)).  This is so because the judge has the opportunity to see and hear the witnesses as they testify, thereby developing a "'feel of the case' that can never be realized by a review of the cold record."  N.J. Div. of Youth & Fam. Servs. v. G.M., 198 N.J. 382, 396 (2009) (quoting D.Y.F.S. v. E.P., 196 N.J. 88, 104 (2008)).

Apropos to the instant matter, we also defer to the trial court when it bases its findings on a review of documentary or video evidence.  State v. S.S., 229

19

N.J. 360, 381 (2017). We do so to for institutional reasons: to recognize the trial court's "experience and expertise in fulfilling the role of factfinder"; to maintain trial courts' "legitimacy"; and to avoid duplicating efforts without significantly improving decisional accuracy. Id. at 380-81. A judge's purely legal decisions, however, are subject to our plenary review. Crespo v. Crespo, 395 N.J. Super. 190, 194 (App. Div. 2007) (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). Governed by these principles, we discern no reason to second-guess the judge's factual or credibility findings and are satisfied his legal conclusions are unassailable. We add the following comments.

Although parents have a presumptive constitutional right to have a relationship with their children, those rights at times must yield to the best interests of the children. In re Guardianship of K.H.O., 161 N.J. 337, 347-48 (1999). The court has a parens patriae responsibility to consider the welfare of the child in resolving custody and parenting time disputes. See Fawzy v. Fawzy, 199 N.J. 456, 474-75 (2009). Indeed, the primary concern of any Family Part judge in a custody matter is to determine what will "protect[] the 'safety, happiness, physical, mental and moral welfare of the child.'" Beck v. Beck, 86 N.J. 480, 497 (1981) (quoting Fantony v. Fantony, 21 N.J. 525, 536 (1956)).

A-3010-19

Where the child's best interests have once been determined through trial or, as here, by consent, the party seeking a modification of the prior custody determination must show a change of circumstances warranting modification. R.K. v. F.K., 437 N.J. Super. 58, 62 (App. Div. 2014); M.P. v. S.P., 169 N.J. Super. 425, 431 (App. Div. 1979).

Regarding Points I, II, and VII, all of which relate to the December 13, 2019 order, we "ordinarily refuse to examine moot matters due to [a] reluctance to render legal decisions in the abstract," but we may choose to rule on such matters if "they are of substantial importance and are capable of repetition yet evade review." In re J.I.S. Indus. Servs. Co. Landfill, 110 N.J. 101, 104 (1988). Here, the custody issues implicated in December 13 order did not escape review, because the judge re-examined the parties' custodial arrangement and replaced the December 13 order with the February 14, 2020 order. The latter order now is the only one governing the parties. Thus, any further review of the December 13 order would "have no practical effect on the existing controversy." Redd v. Bowman, 223 N.J. 87, 104 (2015) (quoting Deutsche Bank Nat'l Trust Co. v. Mitchell, 422 N.J. Super. 214, 221-22 (App. Div. 2011)).

Had the December 13 order survived the entry of the February 14, 2020 order, we still would not conclude the judge erred in suspending defendant's in-

21

person contact with Mark and awarding plaintiff temporary sole physical custody. That is because the judge properly considered testimony, videos, defendant's failure to relinquish custody of Mark pursuant to court order, and the factors set forth in N.J.S.A. 9:2-4 before he entered the emergent order. [4] The evidence the judge relied on amply supported his finding that: the parties have "virtually no ability to agree, communicate, or cooperate in these [custody]

---

[4] N.J.S.A. 9:2-4 provides:

> In making an award of custody, the court shall consider but not be limited to the following factors: the parents' ability to agree, communicate and cooperate in matters relating to the child; the parents' willingness to accept custody and any history of unwillingness to allow parenting time not based on substantiated abuse; the interaction and relationship of the child with its parents and siblings; the history of domestic violence, if any; the safety of the child and the safety of either parent from physical abuse by the other parent; the preference of the child when of sufficient age and capacity to reason so as to form an intelligent decision; the needs of the child; the stability of the home environment offered; the quality and continuity of the child's education; the fitness of the parents; the geographical proximity of the parents' homes; the extent and quality of the time spent with the child prior to or subsequent to the separation; the parents' employment responsibilities; and the age and number of the children. A parent shall not be deemed unfit unless the parents' conduct has a substantial adverse effect on the child.

22

matters;" defendant "set a very poor detrimental example for his child in front of law enforcement" on December 9; and defendant "would rather videotape than parent." We also do not fault the judge for concluding Mark needed stability, and defendant could not meet this need because he was "unwilling or unable to . . . exercise appropriate decorum in front of his child" and was "either unwilling or unable to follow court orders to the letter."

Further, we perceive no basis to second-guess the judge's finding that contact between Mark's paternal grandparents needed to be temporarily suspended in December 2019 in tandem with the suspension he imposed on defendant's parenting time. First, defendant points to no order or agreement between the parties that awarded defendant's parents the right to have independent contact with Mark. Second, the judge found defendant's parents "just sat there [and] did nothing" to facilitate the parenting exchange ordered on December 9. As the judge aptly noted, even if Mark's paternal grandparents did not like plaintiff, they were obliged to "support the health, safety and welfare of this child," and in any event, their contact with Mark was "secondary to [defendant's]."

To the extent defendant contends the judge mistakenly referenced a report from Dr. Barr when he issued his temporary custody ruling, we note the parties

previously lodged no objection to the judge receiving and reviewing that report. Also, the record demonstrates the judge made fleeting references to "Dr. Barr's report," but he primarily relied on the content of defendant's videos when he placed Mark in his mother's sole custody.  In fact, the judge found the videos demonstrated defendant could not or would not effectively coparent, and "clearly thumbed his nose at the [December 9] court order."  Additionally, the judge clarified that whatever information was contained in Dr. Barr's report "may not even be admissible evidence in the plenary [hearing]."  Notably, the judge did not refer to Dr. Barr's report again when he issued his final decision on February 14.  Under these circumstances, any brief consideration the judge gave to Dr. Barr's report would constitute harmless error.  R. 2:10-2.

Regarding Point III, defendant argues the trial court conducted the plenary hearing without giving him proper notice.  We disagree.

A parent has a constitutional right to due process when a change in the custody of a child has been requested, including the right to adequate notice and a fair opportunity to be heard.  Div. of Youth & Fam. Servs. v. M.Y.J.P., 360 N.J. Super 426, 464-66 (App. Div. 2003).  Here, we are satisfied defendant was given both.  In fact, the parties were forewarned by the trial court in June 2019 that they should be ready to try their case that August.  Thereafter, they were

24

afforded additional time to prepare for trial because their matter was rescheduled. Additionally, the parties received notice in November 2019 that they were to appear for a "hearing" on December 9, 2019. Further, contrary to the argument defendant advances on appeal, he told the judge on December 9 that he was "pretty alert that you announced this as a trial hearing."

We also note that when defendant's counsel appeared on December 13 and stated he was "not aware that today was a final hearing on this application," the judge disagreed. The judge found defendant's attorney was instructed by the court days prior to the December 9 hearing that his request for a postponement or to appear by phone was denied and that he was to physically appear as scheduled. Under these circumstances, we cannot conclude the plenary hearing proceeded without proper notice to defendant.

Regarding Points V and IX, we are not persuaded the judge erred when he declined to interview Mark or to appoint a guardian ad litem (GAL) for the child.

Rule 5:8-6 provides in pertinent part:

> As part of the custody hearing, the court may on its own motion or at the request of a litigant conduct an in camera interview with the child(ren). In the absence of good cause, the decision to conduct an interview shall be made before trial. If the court elects not to conduct an interview, it shall place its reasons on the record.

25

"[T]he decision whether to interview a child in a contested custody case is left to the sound discretion of the trial judge, which, as in all matters affecting children, must be guided by the best interest of the child." D.A. v. R.C., 438 N.J. Super. 431, 455-56 (App. Div. 2014). A judge's interview of a child is discretionary, rather than mandatory, regardless of the age of the child. Pressler & Verniero, Current N.J. Court Rules, cmt. on R. 5:8-6 (2022).

Here, the judge stated when the trial began that he would not interview Mark. the judge explained:

> This child does appear to have certain special needs, and I am not going to subject that child to any additional trauma that would be incurred by dragging the child into . . . a courtroom, albeit in a private setting with a judge, and just add to the trauma that this child may have or is continuing to suffer.
>
> The court is confident based on the testimony that . . . . the court is going to have more than enough information . . . . [F]or those reasons, the court is going to decline to . . . interview[] this [eleven]-year-old child.
>
> Certainly the court is always subject to change its position. But, I . . . would be hard pressed . . . to find anything at this juncture overriding what this court is already holding in the best interest of the child not to cause further delay and trauma to the child by dragging the child in here and . . . interviewing him.

The judge reiterated these sentiments on January 31, 2020, after hearing additional testimony from defendant about plaintiff's alleged abuse of Mark. The judge stated, "I am not interviewing [Mark]. It is clear he has significant issues and I'm not going to exacerbate those by putting him through the trauma of having the court interview him." Based on our deferential standard of review, and convinced the judge's factual findings are supported by competent, credible evidence, we find no reason to disturb his decision not to interview Mark.

Similarly, we decline to conclude the judge erred in deciding not to appoint a GAL for Mark. Rule 5:8B provides, in part, that in "cases in which custody or parenting time/visitation is an issue, a [GAL] may be appointed by court order to represent the best interests of the child . . . if the circumstances warrant such an appointment." (Emphasis added). Thus, a trial court is not bound to appoint a GAL simply because a party requests the appointment.

The role of a GAL is "to assist the court in its determination of the . . . minor's best interest." Div. of Youth & Fam. Servs. v. Robert M., 347 N.J. Super. 44, 70 (App. Div. 2002). That is to say, a GAL's

> services are to the court on behalf of the child. The GAL acts as an independent fact finder, investigator and evaluator as to what furthers the best interests of the child. The GAL submits a written report to the court and is available to testify. If the purpose of the

> appointment is for independent investigation and fact finding, then a GAL would be appointed.
>
> [In re M.R., 135 N.J. 155, 173 (1994) (quoting Pressler & Verniero, cmt. on R. 5:8B).]

But a GAL's report and recommendations "may never serve as a substitute for the court's exercise of its parens patriae obligation" and a "trial judge must never 'cede . . . responsibility and authority[,]' or 'abdicate its decision making role to an expert.'" Milne v. Goldenberg, 428 N.J. Super. 184, 202 (App. Div. 2012) (quoting P.T. v. M.S., 325 N.J. Super. 193, 216 (App. Div. 1999)).

Here, defendant ensured that throughout the course of 2019, law enforcement, the Division, and Mark's pediatrician followed up on or investigated his multiple allegations that plaintiff abused Mark. Also, counsel for both parties were given access to the Division's records months before the trial occurred and before the Division closed its investigation upon finding the allegations of abuse were "not established." Given the extent to which Mark's circumstances were scrutinized, we are not persuaded the judge abused his discretion in declining to appoint a GAL for Mark.

Regarding Point IV, defendant argues the judge erred by denying him the ability to call certain witnesses and present certain evidence. Again, we disagree.

28

We review a Family Part judge's evidentiary rulings for an abuse of discretion. N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016). Thus, we reverse discretionary determinations, as with all rulings on the admissibility of evidence, only "when the trial judge's ruling was 'so wide of the mark that a manifest denial of justice resulted.'" N.J. Div. of Youth & Fam. Servs. v. M.G., 427 N.J. Super. 154, 172 (App. Div. 2012) (quoting State v. Carter, 91 N.J. 86, 106 (1982)).

Defendant does not deny that he waited until the trial was due to commence before he sought access to certain records. Nor does he deny that he waited until mid-trial to served subpoenas on multiple witnesses, without notice to plaintiff, despite having several weeks between hearing dates to issue the subpoenas. Despite these dilatory tactics, and over plaintiff's objection, the judge permitted defendant to call any witnesses who were in court on January 31 who had been subpoenaed. One such witness was Mark's maternal grandmother. Given the judge's concern that further delays in the trial would negatively impact Mark, we are not persuaded the judge erred in precluding additional witnesses from testifying at a later date.

Additionally, we are satisfied the judge did not abuse his discretion in denying defendant's belated request for the production of certain records, such

A-3010-19

as confidential Division's records. As discussed, defendant's prior counsel had reviewed records from the Division months before the trial commenced. Also, it appears defendant's trial counsel failed to seek access to such records prior to trial, even though the Division's investigation did not conclude until December 2019. Further, because the judge expressed concern that further delays would negatively impact Mark, and defendant offered no logical reason for waiting until the trial had commenced to seek this evidence, we see no reason to upset the judge's evidentiary rulings.

We need not extensively address defendant's arguments under Points VI and VIII. Suffice it to say defendant's contentions the judge erred in finding he coached the minor child, or that the judge mistakenly equated a "not established" finding by the Division to mean plaintiff did not abuse Mark, are belied by the record and devoid of merit. R. 2:11-3(e)(1)(E).

Finally, regarding Point X, defendant argues the judge mistakenly entertained feedback from a sheriff's officer about a phone conversation defendant had on December 9 while outside the judge's courtroom. During that conversation, defendant apparently mentioned the judge was upset, and the officer related that comment back to the judge. While the judge should not have considered such extraneous information, defendant points to nothing in the

record to support his contention that this lone remark impacted the judge's February 14 decision. Moreover, the record reflects the judge found defendant's attorney intended "no disrespect" when he failed to appear for the December 9 hearing, that defendant's attorney enjoyed "a high level of respect" in his profession and had conducted himself "with the exception of that day with the utmost respect towards the court." Also, the judge stated counsel had "maintained a truly dignified and professional demeanor throughout." Further, the judge accepted counsel's apology for failing to appear on December 9 and concluded no sanctions should be imposed against defendant's attorney because "it's in the past." Considering these facts, we decline to conclude, as defendant urges, that the sheriff's officer's comments were "highly prejudicial" to defendant.

In sum, we discern no error in the custody and parenting time determinations made by the judge to warrant our intervention, and we affirm the February 14, 2020 order. To the extent we have not addressed defendant's remaining arguments, we are convinced they lack sufficient merit to warrant discussion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3010-19